IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JANE DOE,**<br><br>              **Plaintiff,**<br><br>       **v.**<br><br>**RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, DR. NABIL ADAM, and PERIKLIS PAPAKONSTANTINOU,**<br><br>              **Defendants.** | **Civil Action No.**<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Jane Doe ("Jane Doe" or "Plaintiff"), by and through her attorneys, Hach Rose Schirripa & Cheverie, LLP, complaining of Defendants, Rutgers, the State University of New Jersey ("Rutgers" or the "University"), Dr. Nabil Adam ("Dr. Adam") and Periklis Papakonstantinou ("Professor Papakonstantinou") (collectively, "Defendants") brings this action pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq*. ("NJLAD") for (1) sexual harassment; (2) hostile educational environment; and (3) retaliation.  Plaintiff seeks appropriate monetary and other relief to redress the wrongdoing complained of herein:

## **INTRODUCTION**

1.     This action arises from Rutgers' deliberately indifferent response to Plaintiff's complaints of sexual assault and severe and long-running sexual harassment at the hands of her professor and dissertation advisor, Dr. Adam.

2.     Dr. Adam, a distinguished professor at the University, abused his position of authority to sexually assault and harass Plaintiff, ultimately coercing her into a seemingly

"consensual" relationship wherein he continued to assert his influence and power over her to perpetuate sex.

3.      Rutgers' repeated failure to appropriately investigate and respond to the assaults and harassment subjected Plaintiff to a hostile sexual environment, which effectively denied her access to educational and professional opportunities.  Further, as a result of Dr. Adam's conduct and Rutgers' inaction, Plaintiff filed a formal grievance with the University's Office of Employment Equity ("OEE").  Instead of properly addressing her complaint, Rutgers retaliated against Plaintiff by permitting two professors with the Rutgers Business School ("RBS") to illegally seize Plaintiff's personal research data.  When brought to the attention of RBS, the school took no immediate remedial action on Plaintiff's behalf.  Rather, Rutgers wrongfully prevented Plaintiff from accessing her research data for over two months thereby further denying her access to educational and professional opportunities and causing her damages.  Notably, it was not until Plaintiff retained legal counsel that Rutgers took any affirmative steps to restore Plaintiff's access to her research data.  Even now, Plaintiff's access to the data is limited.

4.      Following the investigation, Dr. Adam, with the aid of Professor Papakonstantinou, further retaliated against Plaintiff by widely disseminating disparaging and derogatory comments about Plaintiff to fellow faculty and staff within the Rutgers Business School.   Once again, when brought to the attention of RBS, the school took no immediate remedial action.

5.      Dr. Adam's intentional, malicious and violent conduct, Dr. Adam and Professor Papakonstantinou's retaliation against Plaintiff and Rutgers' deliberate indifference to Plaintiff's plight have subjected Plaintiff to significant and pervasive reputational damage and severe emotional distress, derailed her career, and caused significant damage to her mental health.

## JURISDICTION AND VENUE

6.     This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*  This Court has supplemental jurisdiction over Plaintiff's New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*, claims pursuant to 28 U.S.C. § 1367, as they are related to the claims in this action within the Court's original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution.

7.     Venue is properly laid in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391 because, *inter alia*, Defendant is situated in this district and is subject to this Court's personal jurisdiction, and the unlawful conduct complained of herein occurred within this district.

## PARTIES

8.     Plaintiff, Jane Doe, is an Indian citizen in the United States on an F1 visa.  Plaintiff has been a student and employee at Rutgers since the summer of 2015, when she joined the Rutgers Business School – Newark's Ph.D. program.  Shortly after she arrived at Rutgers, Dr. Adam selected Plaintiff as his research assistant, and agreed to be her advisor for her dissertation. Throughout her tenure at Rutgers, Plaintiff has demonstrated outstanding academic achievements. She has co-authored four papers in peer-reviewed journals and conferences, and won recognition from faculty and collaborators for her indispensable contribution to projects and exemplary work ethics.  She is a recipient of the Alpha Gamma Beta Award, the highest scholastic achievement for a business major.  In addition, Plaintiff also served as an Instructor and Teaching Assistant at the Rutgers Business School.  Plaintiff currently resides in Kearney, New Jersey.

9.      Defendant, Rutgers, the State University of New Jersey, is a public educational institution with its principal place of business at 57 U.S. Highway 1, New Brunswick, New Jersey 08901.  Rutgers operates the Newark campus of the Rutgers Business School, which is located at One Washington Park, Newark, New Jersey 07102.  At all times relevant to this action, Rutgers received federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and was otherwise subject to Title IX.

10.      Defendant, Dr. Nabil Adam, has served as a faculty member at Rutgers for over forty years.  He is a Distinguished Professor of Computers and Information Systems, Vice Chancellor for Research & Collaborations for Rutgers Business School (Newark), and Founding Director of both the Rutgers Institute for Data Science, Learning, and Applications ("I-DSLA") and the Rutgers Center for Information Management, Integration and Connectivity ("CIMIC") Research Center.  At all times relevant to this action, Dr. Adam served as Plaintiff's professional mentor.

11.      Defendant, Periklis Papakonstantinou, has been an assistant professor at the Operations Research and Related Information Systems Department at Rutgers Business School since 2015.

## SUBSTANTIVE ALLEGATIONS

**Dr. Adam Uses His Position of Power to Overwhelm
Plaintiff and Create a Dependent Relationship**

12.      Plaintiff enrolled in a Ph.D. program at RBS in the summer of 2015.  She applied to work with Dr. Adam, a highly celebrated and long-tenured professor at Rutgers, in hopes that working with him would prove beneficial to her career and future endeavors.  At the time she applied to work with Dr. Adam, he had been a faculty member at Rutgers for several decades.

13.     Shortly after Plaintiff arrived at Rutgers in the summer of 2015, Dr. Adam selected her to serve as his research assistant.  On or about this time, Dr. Adam also agreed to be Plaintiff's preliminary advisor for her dissertation.

14.     After commencing her work with Dr. Adam, Plaintiff soon learned that Dr.  Adam was a demanding advisor; he worked constantly and expected his students to be available on weekends and very early in the morning to attend to his every need.  Indeed, Plaintiff was forced to spend almost every other weekend at one of Dr. Adam's two homes, located in Williamstown, Massachusetts and Manhasset, New York, to work with him on their research.[1]

15.     As a result of Dr. Adam's demands, Plaintiff's workload was immense.  The excessive amount of time she was required to spend with Dr. Adam resulted in the two developing a personal comfort and openness with each other.  This comfort resulted in Plaintiff confiding in Dr. Adam that she had separated from her husband in early 2015.

16.     Shortly thereafter, Dr. Adam took advantage of Plaintiff's admiration and trust and began making unsolicited comments to her about her appearance, oftentimes commenting that he found her to be "attractive."

17.     Because Plaintiff viewed Dr. Adam as a "father figure," she always expressed a very neutral and cold response to his unwarranted sexual comments.  Nevertheless, Dr. Adam's comments persisted.

**Dr. Adam Sexually Assaults and Rapes Plaintiff**

18.     On or about January 14, 2016, Plaintiff and Dr. Adam were working alone together in the evening in Dr. Adam's campus office, located at the Center of Law and Justice at 123

---

[1] One observer, Mr. Peter Varsanyi, Special Projects Researcher at RBS-Newark and friend of Plaintiff, found the weekends that Plaintiff and Dr. Adam spent together to be particularly odd, given that Dr. Adam appeared to "work [Jane Doe] day and night" and professional obligations did not require them to spend so much time together.

Washington Street, Newark, New Jersey.  Plaintiff was sitting next to Dr. Adam as they worked. Without warning or provocation, Dr. Adam started to kiss Plaintiff and slid his hands between her legs and into her pants.  Dr. Adam then attempted to undress her.  Realizing that his office was not private enough, Dr. Adam repeatedly asked Plaintiff to accompany him to the CIMIC Research Center.  Outraged by Dr. Adam's behavior, Plaintiff began to make up excuses as to why she could not follow him.  Over her constant objections, Dr. Adam became authoritative and forced her to walk with him to the CIMIC Research Center, then located at 1 Washington Park, Newark, New Jersey.

19.     Once they arrived at the CIMIC Research Center, Dr. Adam brought Plaintiff to an empty conference room and forcefully undressed her.  He then exposed himself and began rubbing his penis against her genitalia.  Dr. Adam then grabbed Plaintiff's head and forced his penis into her mouth.  The encounter culminated with Dr. Adam masturbating to completion in front of Plaintiff, resulting in some of his ejaculate staining Plaintiff's shoes.

20.     After the sexual assault, Plaintiff returned to her apartment and called her ex-husband, another Ph.D. candidate at RBS, who was in India at the time.  During their conversation, Plaintiff informed her ex-husband that Dr. Adam had made a sexual advance and was "forceful" with her.  Plaintiff cried as she relayed the night's events to him and expressed her fear of filing a complaint against Dr. Adam because he was a "powerful man."

21.     The next afternoon, on January 15, 2016, Dr. Adam emailed Plaintiff with the subject line "Follow up" about work-related topics, adding, "How about if you give me a call afterwards."

22.     Plaintiff, hoping to keep matters strictly professional, replied to Dr. Adam's email with comments on the status of her work.

23.     That evening, at 7:19 p.m., Dr. Adam replied to the email chain, changing the subject line to "Follow up – Your Decision," with the following message:

> I just wanted to come back to this point.  I found you to be a real smart, hard working, and committed student.  I have, and every Professor (and students for that matter) worked wit [sic] you has, been very happy having you on the team.  I know you are working hard and putting a lot of efforts on our projects.  And you are making a great impact.  ***But, I must be fair to you and make sure that you know that you are always free to and have an option to switch advisor.  Please rest assured that I would not take it personally and I will respect your decision*** and I would always credit you with all your hard work and excellent results obtained so far.  ***So give it careful thought and make your decision.*** (Emphasis added).

24.     Believing that Dr. Adam's email was a sign that he felt guilty for sexually assaulting her the night before, but still fearful of his ability to derail her career, Plaintiff replied to his email later that night, writing, in part: "You know I respect you a lot.  Also staying away from home and away from parents we always look upon as [sic] our advisors like our guardian.  Some situations arise in life which may have no explanation or seem out of place.  But I do still have the same respect and aspirations to work with you."

25.     Up to this point – spanning more than six months of their working relationship – Plaintiff always addressed Dr. Adam as "Professor" or "Sir," per Indian custom.  However, on January 18, 2016, in an attempt to lure Plaintiff in and regain her trust, Dr. Adam emailed Plaintiff late in the evening requesting, apropos of nothing: "Could I ask you a favor.  Instead of calling me [']Sir['], could you call me please with my name…"

26.     On January 20, 2016, Dr. Adam informed Plaintiff that he would be returning from a meeting in Washington D.C. around 4:30 in the afternoon and that he intended on stopping by the CIMIC Research Center.  Upon his arrival, Dr. Adam made physical advances toward Plaintiff and once again attempted to sexually assault her.  Incensed by Dr. Adam's continued conduct,

especially in light of his January 15 email, which Plaintiff perceived to be an apology for the January 14 assault, she immediately left the CIMIC Research Center to return to her apartment.

27.     Dr. Adam became furious with Plaintiff.  After Plaintiff left the CIMIC Research Center having rebuked his sexual advances he called her numerous times on her cell phone.  Failing to get a hold of Plaintiff, Dr. Adam emailed her late that evening: "I tried calling you but no answer?  I will try again in a couple of minutes."

28.     In utter fear of retribution by Dr. Adam for rejecting his advances, and in fear of her own safety from the bombarding attempts to communicate with her, Plaintiff finally acquiesced and answered Dr. Adam's calls.

29.     Dr. Adam requested that the two meet privately the next morning to discuss the events of January 14 and the days that followed.  Dr. Adam, under the guise of ensuring Plaintiff feel comfortable with the location, suggested her apartment as the location for the meeting.  Feeling safe in her own home, Plaintiff agreed to meet.

30.     The next morning, January 21, 2016, Dr. Adam visited Plaintiff at her apartment. It quickly became clear to Plaintiff that Dr. Adam had no intention of discussing the January 14 incident or the harassing phone calls and emails that followed.

31.     Instead, Dr. Adam grabbed Plaintiff, forcefully undressed her, forced her into her bedroom and raped her.  When Dr. Adam was done, he took a shower in Plaintiff's apartment and then left Plaintiff's apartment like nothing had happened.

**Dr. Adam Coerces Plaintiff into a Seemingly "Consensual" Relationship**

32.     Following the aforementioned sexual assaults, Dr. Adam continued to make unwarranted sexual advances toward Plaintiff, repeatedly kissing and groping her despite her apparent discomfort.  He often spoke about her physical appearance and the pleasure of having

sexual intercourse with her.  Comparing Plaintiff to his wife, he remarked "It [sexual intercourse] is more enjoyable with you since you are young and attractive."

33.     Throughout the following months, Dr. Adam continued to pressure Plaintiff to engage in sexual activity with him.  Dr. Adam's sexual advances were unwelcomed by Plaintiff, who became emotionally traumatized as a result of his sexually coercive behavior.

34.     Worn down by Dr. Adam's persistent demands and in continued fear of retribution, Plaintiff began to succumb to Dr. Adam's sexual advances.

35.     Dr. Adam, under the guise of furthering Plaintiff's professional development and research, demanded that Plaintiff spend a considerable amount of time alone with him.  Plaintiff was generally required to work upwards of twelve hours per day – oftentimes working into the late evening hours.  Dr. Adam took advantage of these late nights, when most of the students and staff had gone home, to regularly coerce Plaintiff to have sex with him.

36.     Moreover, Dr. Adam generally insisted that Plaintiff accompany him to various meetings and seminars, and when the pair traveled together for conferences, they would stay in the same hotel room.

37.     In addition, almost every other weekend, Plaintiff was asked to visit either of Dr. Adam's two residences so that the he and Plaintiff could work together on their research.  Dr. Adam took advantage of their time together and would engage in sexual activity with Plaintiff when his wife was either out of the house or asleep.

**Dr. Adam Inflicts Extreme Psychological Distress**
**Upon Plaintiff, Forcing Her to Attempt Self-Harm**

38.     Despite becoming dependent on Dr. Adam, Plaintiff started experiencing psychological distress and began to question Dr. Adam about the fate of their relationship, at times

indicating that she wanted to end the relationship because it was causing her too much distress and affecting her ability to focus on her work.

39.     In fact, Plaintiff sent several emails to Dr. Adam indicating her mental instability and her desire to "quit life," yet Dr. Adam never once reported these emails to Rutgers' authorities or took any steps to ensure her safety.[2]

40.     Moreover, between June 1 and June 3, 2017, Plaintiff sent the following emails to Dr. Adam accusing him of being a "rapist:"

    a.  "YOU ARE A SHAMELESS, GUILTLESS RAPISTThat [sic] bad you are;"

    b.  "You demand respect like MY DAD, BUT HE IS NOT A RAPIST.  DO YOU UNDERSTAND THAT?  YOU ARE A GUILTLESS RAPIST, RAPIST, and a RAPIST;"

    c.  "Are you doing JUSTICE TO THE POSITION OF A DISTINGUISHED PROFESSOR?  YOU ARE A RAPIST, DO YOU STILL DESERVE THAT RESPECT OF A PROFESSOR?"

(Emphasis in originals).

41.     As detailed herein, despite the severity of the aforementioned allegations, Dr. Adam never once reported Plaintiff's accusations of rape to Rutgers' authorities.[3]

42.     Meanwhile, Plaintiff's mental health continued to decline and she attempted suicide three times.  On the first two occasions, Dr. Adam was present with her after the attempt and took care of her.  On the third occasion, July 2, 2017, Plaintiff attempted to overdose by swallowing

---

[2] Not only did Dr. Adam fail to report Plaintiff's threats of self-harm, he also affirmatively instructed his administrative assistant, Lisa Condoberry, to ignore one such threat contained in a June 17, 2017 email on which she was copied.

[3] Dr. Adam's failure to report Plaintiff's allegations is a direct violation of the Rutgers University Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking and Related Misconduct by Employees and Third Parties (the "Sexual Misconduct Policy"), annexed hereto as **Exhibit A**, which specifically states that "[i]f an administrator, supervisor, or faculty member receives a complaint of conduct allegedly in violation of this Policy, he or she has an affirmative duty to promptly report it to the Office of Employment Equity."

sleeping pills. She subsequently passed out alone in the street and was taken to Clara Mass Medical Center by ambulance.

43.     Before Plaintiff attempted suicide the third time, she had disclosed her relationship with Dr. Adam to his wife and son and had also reported it to Professor Jaideep Vaidya ("Professor Vaidya").

44.     Professor Vaidya reported the concerns raised by Plaintiff in her email to him with the OEE; however, upon recovery, Plaintiff declined to file a formal complaint with the OEE because she felt pressured, intimidated and confused by Dr. Adam. Moreover, Plaintiff feared being disparaged by her colleagues and also feared any negative consequences that the filing of such a complaint could potentially have on her academic career.

**Despite the Commencement of an Independent
University Action, Dr. Adam's Abusive Behavior Continues**

45.     Notwithstanding the fact that Plaintiff declined to make a formal complaint, the OEE proceeded with an independent university action (the "University Action"), during the course of which, Dr. Adam was instructed not to communicate with Plaintiff.

46.     Dr. Adam did not heed the University's instructions. Throughout the entirety of the investigation, Dr. Adam was in constant contact with Plaintiff. He not only questioned her about work-related matters, but also inquired about the status of the University Action. Moreover, when Plaintiff attempted to cease all communication with Dr. Adam, Dr. Adam responded by leaving notes on Plaintiff's desk.

47.     One evening, before the conclusion of the University Action, Dr. Adam approached Plaintiff at her cubicle and insisted she accompany him to his office to discuss research and the status of the investigation. Because Dr. Adam's office was open and less secluded than her current surroundings, Plaintiff agreed to follow. Once there, Dr. Adam resorted back to the same abusive

behavior.  While Plaintiff was standing next to Dr. Adam's desk, Dr. Adam, who was seated in a

chair at the time, grabbed Plaintiff's hand, unzipped his pants and forced her to touch his penis.

Shocked, Plaintiff immediately pulled her hand away.

**Despite Declining to Make a Formal Complaint, the OEE**
**Accuses Plaintiff of Bringing False Accusations Against Dr. Adam**

48.     On September 15, 2017, the OEE issued the findings of the University Action.

Unable to determine that the Sexual Misconduct Policy had been violated because both Plaintiff

and Dr. Adam denied the existence of a sexual relationship, the OEE determined that Plaintiff

brought false accusations against Dr. Adam.

49.     The results of the University Action investigation were distributed to Dean Lei Lei,

("Dean Lei"), Executive Vice Dean Yaw Mensah ("Dr. Mensah") and Associate Dean Manish

Kumar, causing severe reputational damage and disgrace to Plaintiff.[4]

50.     Within hours of the OEE's September 15, 2017 University Action report being

issued, Dr. Adam emailed Plaintiff writing, "They were very sloppy!!  Very unfortunate . . ."

51.     The next day, on September 16, 2017, despite the allegations levied against him,

Dr. Adam emailed Ms. Grosskreutz, OEE Director, asking that he be permitted to remain

Plaintiff's advisor, writing,

> Given that [Jane Doe] was sick at the time, the valuable time she lost over the
> summer break and the time she stands to lose if she were to change advisor, and the
> fact that she is in an excellent academic standing; I have decided to continue to

---

[4] On November 27, 2017, Plaintiff received Dean Lei's determination letter (the "Dean's letter")
which outlined the remedial measures to be taken in light of the OEE's University Action findings.
Professor Suresh Govindaraj, Ph.D. in Management Program Director; Lisa Grosskreutz ("Ms.
Grosskreutz"), Office of Employment Equity; Dr. Adam; and Professor Papakonstantinou all
received a copy of the Dean's letter.  Upon information and belief, Professor Papakonstantinou
also shared the contents of the Dean's letter with various RBS faculty members and Ph.D. students
as well as with the Department Coordinator, Luz Kosar ("Ms. Kosar").  Moreover, a copy of the
Dean's letter has been placed in Plaintiff's student file.  The widespread dissemination of the
Dean's letter, coupled with permanence of the letter on Plaintiff's student record, has caused and
continues to cause Plaintiff severe reputational harm.

serve as [Jane Doe's] advisor, help her get her Ph.D. and have a successful academic career.  This assumes it is agreeable to [Jane Doe] and Dean Lei.

52.     Later that evening, Plaintiff was informed by Dr. Mensah that due to the results of the University Action investigation, she would be assessed by Dr. Sandra Samuels, MD, Director of the RU Health Service-Newark, before being permitted to return to work.

53.     On September 17, 2017, just two days after the OEE released the findings of the University Action, Plaintiff emailed Dr. Adam's wife and confessed that she was not forthcoming during the University Action interview, writing in part:

> He knows whatever he has done to me is not acceptable . . . I decided to withdraw the complaint and in doing so I have to lie so much, crush the truth.  In fact at the end I am the one who is blamed to have violated the policy because things I was saying to hide the truth was obviously incoherent.

54.     While Plaintiff awaited formal approval to return to work, Dr. Adam continued to communicate with her about research and work-related projects.  Dr. Adam even assured Plaintiff that he would persuade Professor Papakonstantinou to agree to be her advisor "on paper," but that he would continue to be very involved in her research.

55.     Finally, on October 19, 2017, more than a month after the OEE's University Action determination, Plaintiff was cleared to return to work, resume her research and continue with her Ph.D. dissertation.

**Once Again, Dr. Adam Sexually Assaults and Rapes Plaintiff**

56.     Notwithstanding the seriousness of the allegations brought against him and well aware of Plaintiff's emotional and mental fragility, Dr. Adam continued to harass Plaintiff and, when Plaintiff refused to give into his sexual demands, Dr. Adam became forceful.

57.     During one evening in late October/early November 2017, Plaintiff went to the CIMIC Research Center to retrieve an item from her desk.  Dr. Adam, who happened to be present

at the CIMIC Research Center at the time, soon began talking to Plaintiff about a work-related project.   Unprovoked, Dr. Adam grabbed Plaintiff, forcefully pulled down her pants, began rubbing his penis against her genitalia – which resulted in some of Dr. Adam's semen staining Plaintiff's trousers – and once again raped Plaintiff.

58.     After the assault, Dr. Adam acted like nothing had happened.  Both individuals exited the building and went their separate ways; however, the incident left Plaintiff extremely anxious when returning to the CMIC Research Center for fear that Dr. Adam could be there at any given moment.

59.     In the weeks that followed, Dr. Adam continued to toy with Plaintiff's emotional and psychological well-being.  He demonstrated concern and affection for Plaintiff, but Plaintiff, aware of the totality of Dr. Adam's actions, recognized the manipulative nature of his behavior.

**Rutgers Fails to Appropriately Investigate Plaintiff's**
**Sexual Assault and Harassment Allegations**

60.     On November 21, 2017, Plaintiff met with Vice Chancellor Corlisse Thomas, at which point she revealed that she did in fact have a sexual relationship with Dr. Adam, which grew out of a pattern of assault.  She then asked that the OEE investigation into Dr. Adam's conduct be reopened.

61.     On November 27, 2017, after experiencing over a year of turmoil and mental anguish as a result of Dr. Adam's conduct, Plaintiff filed a formal complaint against Dr. Adam with the OEE (the "OEE Investigation").

62.     During her interview with the Associate Director of the OEE, Carolyn Dellatore ("Ms. Dellatore"), Plaintiff recounted the sexual harassment and assaults that she suffered as a result of Dr. Adam's conduct.  She also informed Ms. Dellatore that the pattern of assault eventually turned into a seemingly "consensual" relationship.

63.     Plaintiff fully cooperated with the OEE Investigation by turning in relevant emails, text messages and skype conversations between Dr. Adam and herself.  In addition, Plaintiff provided to the OEE the pair of trousers stained with Dr. Adam's semen.

64.     In connection with the OEE Investigation, Plaintiff also gave a formal statement to Sergeant Joseph Ray of the Rutgers Police Department, who subsequently took the semen-stained trousers into evidence. The pants were eventually returned to Plaintiff, who handed them over to Ms. Dellatore.  Ms. Dellatore then delivered the pants to ARCpoint Labs, who verified that the material on the pants was in fact human semen.  Dr. Adam has refused, however, to participate in a DNA comparison test (which would only require Dr. Adam to provide a cheek swab) to determine the origin of the semen.

65.     Pursuant to the OEE Investigation, Ms. Dellatore also interviewed Dr. Adam who, despite vehemently denying the existence of a sexual relationship between him and Plaintiff, failed to proffer any plausible explanation as to why he:

     a.   failed to report Plaintiff's accusations of rape to the OEE or any other authorities;

     b.   failed to report Plaintiff's frequent threats of self-harm; or

     c.   failed to deny any of the allegations levied against him.

66.     Despite the severity of the accusations, Dr. Adam actually went out of his way to maintain a relationship with Plaintiff – first by petitioning to remain her advisor and later by withholding information in connection with the OEE Investigation because he did not want to "jeopardize her career."

**Dr. Adam and Professor Papakonstantinou Retaliate Against
Plaintiff by Disseminating False and Disparaging Information**

67.     On or about March 15, 2018, Plaintiff's sexual assault and harassment allegations against Dr. Adam became public via a news article published in *The Star-Ledger.*

68.     In response to the allegations against him becoming public, Dr. Adam began to maliciously malign Plaintiff within the academic community.  To disparage Plaintiff, Dr. Adam enlisted the aid of Professor Papakonstantinou.  Dr. Adam shared selected emails and prior OEE investigative documents with Professor Papakonstantinou, and in response, Professor Papakonstantinou assured Dr. Adam that he would do anything he could to help him.  Specifically, Professor Papakonstantinou informed Dr. Adam that "[Jane Doe] will be nuclear after this . . . Let me know how I can help you more concretely."[5]

69.     Thereafter, both Dr. Adam and Professor Papakonstantinou disseminated false and disparaging information about Plaintiff throughout RBS.  Notably, Dr. Adam emailed and communicated with RBS faculty and staff despite being ordered not to do so while on administrative leave.[6]

70.     In addition to disseminating false information about Plaintiff, Professor Papakonstantinou also made abusive comments toward her, at one point remarking "fuck you." He even went as far as to publicly disparage Plaintiff by calling her a ***"prostitute"*** in front of respected RBS faculty, including Ms. Kosar and Plaintiff's current advisor, Dr. Michael Katehakis ("Dr. Katehakis").  Upon information and belief, Professor Papakonstantinou also made disparaging and offensive remarks about Plaintiff and Dr. Katehakis.

---

[5] As demonstrated above, during the OEE's University Action, Dr. Adam assured Plaintiff that he would persuade Professor Papakonstantinou to agree to be Plaintiff's advisor "on paper."  In return for the favor, Dr. Adam assured Professor Papakonstantinou that he would help him with his tenure.

[6] Dr. Adam was placed on paid administrative leave pending the conclusion of the OEE Investigation and was strictly prohibited from entering campus, engaging with students and participating in any university activities.  Nonetheless, Dr. Adam was present on campus at various times during his administrative leave – causing Plaintiff to fear for her safety.

71.   Plaintiff reported Dr. Adam and Professor Papakonstantinou's harassing behavior and disparaging comments to RBS authorities, but at the time, the RBS authorities ignored Plaintiff's allegations and allowed the harassment to continue.

72.   By widely disseminating false and defamatory remarks about Plaintiff and by continuing to ignore Plaintiff's allegations of such harassment, Defendants have perpetuated the hostile environment created by Dr. Adam and have caused Plaintiff to suffer and to continue to suffer further reputational damage and harm.

**Rutgers Fails to Appropriately Respond to Plaintiff's**
**Sexual Assault and Harassment Allegations**

73.   On April 17, 2018, the OEE released the results of its investigation.  Notably, the lead investigator, Ms. Dellatore, found it "astounding" that Dr. Adam did not report Plaintiff's accusations of rape to university administration.  Questioning why Dr. Adam failed to do so, Ms. Dellatore noted, "[i]t strains credulity to believe that a Vice Chancellor and Distinguished Professor, supporting millions of dollars in grants, would jeopardize his career in such a way unless he had something to hide."  Ms. Dellatore further noted:

> Dr. Adam refused to submit to DNA testing which, if his denials are truthful, would presumably have failed to match his sample to the semen on the pants.  While he professed that he cooperated fully during the investigation but "drew the line" at such an invasion of privacy, the reality is that ***Dr. Adam misrepresented and withheld information throughout the entire process***, and this final refusal to validate or discredit the one purported piece of material evidence is extremely troubling. (Emphasis added).

74.   Notwithstanding the numerous holes and inconsistencies in Dr. Adam's story, the OEE, unable to determine that Dr. Adam sexually assaulted Plaintiff or that the parties engaged in a sexual relationship of any kind, concluded only that Dr. Adam violated his reporting obligation by failing to alert the OEE regarding Plaintiff's previous allegations of rape.

75.     On May 9, 2018, Plaintiff appealed the OEE's decision on the following grounds: new information, misrepresentation of certain facts and an unsupported conclusion.

76.     Despite proffering new evidence and clarifying contradictory facts, on May 17, 2018, the OEE denied Plaintiff's appeal.

**Rutgers Retaliates Against Plaintiff for**
**Bringing Allegations Against Dr. Adam**

77.     Following the release of the OEE Investigation Report on April 17, 2018, Plaintiff suffered a severe panic attack which caused her to be hospitalized for nine days.

78.     Upon her release from the hospital, Plaintiff soon discovered that the data storage device which housed vital information necessary for the completion her Ph.D. research was missing.

79.     Plaintiff was then informed that Professor Vijay Atluri ("Professor Atluri"), her advisor at the time, and Professor Vaidya took the data in order to "safeguard" it; however, when Plaintiff asked for access to the data, both Professors Atluri and Vaidya denied her request. Plaintiff later learned that, without even consulting her about the status of her project, Professors Atluri and Vaidya had assigned the same project to someone else.

80.     Plaintiff subsequently contacted Dean Lei who informed her that the University would "arrange" for her to regain access to the data. However, no accommodations were made at that time.

81.     On or about July 10, 2018, after being denied access to the pivotal data for over two months, Plaintiff was finally granted "limited" access to the data.  Currently, Plaintiff shares access to the data, which she is permitted to access approximately two to three days per week.

82.     By denying and/or limiting Plaintiff's access to this vital research data, Rutgers has caused and continues to cause Plaintiff to suffer significant delays in the completion of her Ph.D. program, thereby resulting in harm.

83.     Moreover, from the period of July 2017 to January 2018, Plaintiff was without an assigned academic advisor.  Because academic advisors are critical to a student's development and progression, the absence of an academic advisor during the aforementioned period has also caused Plaintiff to suffer significant delays in the completion of her Ph.D. program.

## DAMAGES

84.     Defendants' actions altered and worsened the conditions of Plaintiff's environment at Rutgers.  Moreover, Dr. Adam's conduct was so severe, pervasive, and/or objectively offensive that it deprived Plaintiff of access to educational opportunities and benefits.

85.     As a direct and proximate result of Defendants' misconduct, Plaintiff has suffered and continues to suffer from physical and psychological injures, including but not limited to:

  a. Insomnia and generalized anxiety;

  b. Substantial weight loss;

  c. Sense of betrayal;

  d. Strong sense of guilt and shame;

  e. Extreme difficulty concentrating and an inability to read and carry out research;

  f. Dissociation after encountering reminders of her sexual assault and harassment;

  g. Sexually disturbing and violent nightmares and memories; and

  h. Feelings of despair and hopelessness.

86.     As demonstrated above, Plaintiff's emotional distress and mental anguish were so severe that she attempted suicide three times, for which she has sought counseling.

87.     Additionally, as a direct result of Defendants' actions, Plaintiff has suffered and continues to suffer substantial reputational harm and has been rebuked for raising allegations against a senior faculty member.

88.     As a direct result of the irreparable damage done to her reputation, Plaintiff's ability to secure future employment has been severely hindered, causing her to currently suffer and continue to suffer significant financial losses in the future.

89.     Moreover, Rutgers has impeded Plaintiff's ability to timely finish her Ph.D. program by denying or limiting her access to pivotal research data necessary to complete her work, resulting in further damage to her academic reputation and future job prospects.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF TITLE IX – 20 U.S.C. § 1681 – *et seq.*
### SEX DISCRIMINATION/SEXUAL HARASSMENT
(Against Defendant Rutgers)

90.     Plaintiff repeats and realleges by reference each and every allegation contained in the above stated paragraphs and incorporates the same herein as though fully set forth.

91.     Defendant Rutgers does and has received federal financial assistance through Title IX during all relevant times mentioned herein.  Accordingly, Defendant Rutgers' entire operations are subject to the prohibition on sex discrimination under Title IX, 20 U.S.C. § 1687(2)(A).

92.     Plaintiff was assaulted, harassed and subjected to humiliating and demeaning conduct at the hands of her supervisor, Dr. Adam, based on Plaintiff's sex.

93.     The harassment was so severe, pervasive, and objectively offensive that it and Defendant Rutgers' failure to appropriately respond effectively constituted discrimination against Plaintiff on the basis of her sex.

94.     Defendant Rutgers' officers with authority to take corrective measures had actual knowledge of the assault, harassment and conduct of Dr. Adam.

95.     Despite having such knowledge of the assault and the harassing and demeaning conduct on the basis of Plaintiff's sex, Defendant Rutgers failed to take corrective measures.

96.     Defendant Rutgers' acts and omissions constituted discrimination and indifference against Plaintiff on the basis of her sex.

97.     As a direct and proximate result of the Defendant Rutgers' discriminatory conduct, Plaintiff was caused to suffer monetary damages, severe emotional distress, suffering and humiliation, and mental distress and anguish.

98.     As a result of the Defendant Rutgers' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**COUNT II**
**VIOLATION OF TITLE IX – 20 U.S.C. § 1681 – *et seq.***
**RETALIATION**
(Against Defendant Rutgers)

99.     Plaintiff repeats and realleges by reference each and every allegation contained in the above stated paragraphs and incorporates the same herein as though fully set forth.

100.    Defendant Rutgers does and has received federal financial assistance through Title IX during all relevant times mentioned herein. Accordingly, Defendant Rutgers' entire operations are subject to the prohibition on sex discrimination under Title IX, 20 U.S.C. § 1687(2)(A).

101.    Plaintiff engaged in protected activity by complaining to Defendant Rutgers about Dr. Adam's sexual assault and harassment of Plaintiff.

102.    Defendant Rutgers retaliated against Plaintiff by denying and/or limiting Plaintiff's access to critical research necessary for the completion of her degree.

21

103.    Defendant Rutgers retaliated against Plaintiff by not disciplining Dr. Adam, but instead disciplining Plaintiff for allegedly making false accusations against Dr. Adam in violation of the Sexual Misconduct Policy, and subsequently requiring her to undergo a medical evaluation before allowing her to return to work over a month later.

104.    Defendant Rutgers has intentionally retaliated against Plaintiff for complaining about Dr. Adam's sexual misconduct and commencing an investigation into allegations of sexual assault and harassment in violation of Title IX.

105.    As a direct and proximate result of the Defendant Rutgers' discriminatory conduct, Plaintiff was caused to suffer monetary damages, severe emotional distress, suffering and humiliation, and mental distress and anguish.

106.    As a result of the Defendant Rutgers' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## COUNT III
### VIOLATION OF NJLAD – N.J.S.A. 10:5-1 *et seq.* – SEX DISCRIMINATION/SEXUAL HARASSMENT
(Against All Defendants)

107.    Plaintiff repeats and realleges by reference each and every allegation contained in the above stated paragraphs and incorporates the same herein as though fully set forth.

108.    By and through their course of conduct, Defendants willfully violated the New Jersey Law Against Discrimination by subjecting Plaintiff to disparate treatment and a hostile work environment based on her gender.

109.    Plaintiff was impermissibly treated differently from others because she is female, and such conduct constituted an unlawful employment practice under the NJLAD.

110.    Defendants participated in, condoned, ratified, perpetuated, conspired, incited, coerced, induced and/or aided and abetted the NJLAD violations.

111.    As a direct and proximate result of the Defendants' discriminatory conduct, Plaintiff was caused to suffer monetary damages, severe emotional distress, suffering and humiliation, and mental distress and anguish.

112.    As a result of the Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**COUNT IV**
**VIOLATION OF NJLAD – N.J.S.A. 10:5-1 *et seq*. –**
**RETALIATION**
(Against All Defendants)

113.    Plaintiff repeats and realleges by reference each and every allegation contained in the above stated paragraphs and incorporates the same herein as though fully set forth.

114.    By and through their course of conduct, Defendants willfully violated the New Jersey Law Against Discrimination by retaliating against Plaintiff and by treating Plaintiff in a hostile, discriminatory or altered manner in reprisal for Plaintiff's legally protected complaints.

115.    Plaintiff was impermissibly retaliated against for complaining of workplace discrimination, including complaints of sexual assault and harassment.

116.    Defendant Rutgers' actions in denying and/or limiting Plaintiff's access to critical research necessary for the completion of her degree constitutes a reprisal prohibited under the New Jersey Law Against Discrimination.

117.    Defendant Adam and Defendant Papakonstantinou's continuous harassment and public disparagement of Plaintiff constitutes a reprisal prohibited under the New Jersey Law Against Discrimination.

118.    As a direct and proximate result of the Defendants' discriminatory conduct, Plaintiff was caused to suffer monetary damages, severe emotional distress, suffering and humiliation, and mental distress and anguish.

119.    As a result of the Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief: Compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
       August 17, 2017

Respectfully submitted,
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
By: _/s/ Frank R. Schirripa_
Frank R. Schirripa
Kathryn A. Hettler
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
_Counsel for Plaintiff_